ORDERED.

**Dated:  May 04, 2023**

_____
Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Summit II, LLC,                                          Case No.: 8:22-bk-03844-RCT
                                                                  Chapter 11, Subchapter V

     Debtor.

_____/

## MEMORANDUM DECISION AND ORDER GRANTING
## MOTION TO ASSUME LAND PURCHASE CONTRACT AS MODIFIED

Before the Court, following a two-day joint trial, are Debtor Summit II, LLC's *Motion to Approve and Assume the Land Purchase Contract as Modified by the First and Second Amendments By and Between the Debtor and Harry and Janet Denlinger* (Doc. 20) (the "Motion to Assume"); the opposition to the Motion to Assume (Doc. 35) filed by Janet L. and Harry R. Denlinger (the "Denlingers"); the Denlingers' adversary complaint seeking declaratory relief (Adv. No. 8:22-ap-00193-RCT (the "Adversary"), Doc. 3-4) (the "Complaint");[1] and the Answer, Affirmative Defenses and Counterclaim filed by Debtor (Adversary Doc. 12) and the Answer, Affirmative Defenses and Counterclaim filed by D.R. Horton, Inc. ("D.R. Horton") (Adversary

---

[1]  The Denlingers filed their Complaint on Oct. 26, 2021, in the Circuit Court of the Sixth Judicial Circuit for Pasco County, commencing Case No. 21-CA-002508, titled *Janet L. Denlinger and Harry Ryder Denlinger vs. Summit II, LLC and D.R. Horton, Inc.* (the "State Court Action").  Debtor removed the State Court Action to this Court pursuant to 28 U.S.C. § 1452 on the day it commenced this bankruptcy case.  Adv. Doc. 1.

Doc. 3-18) (together, the "Counterclaims").  At the start of the joint trial, the Court granted the Denlingers' *ore tenus* motion to bifurcate issues of Debtor's damages, if any.  Accordingly, trial proceeded on the factual questions central to resolution of the Motion to Assume, the Complaint, and the Counterclaims, namely:

(1) whether the Land Purchase Contract Between the Denlingers and D.R. Horton dated November 18, 2020, as modified by the first amendment dated January 12, 2021, and second amendment dated May 3, 2021 (collectively, the "Land Contract")[2] remains valid and enforceable or whether it expired according to its terms;

(2) if the Land Contract remains valid and is executory, whether it was properly assigned to Debtor such that Debtor might assume the Land Contract in its Subchapter V case;[3] and

(3) which party breached the Land Contract in failing to close on the real property.

At trial, the Court heard testimony from Dr. Douglas Weiland, Debtor's managing member, Mr. John Snyder, D.R. Horton's Vice President of Land, Jacob T. Cremer, Esq., Debtor's land use attorney, and Dr. J. Michael Shea, the Denlingers' attorney.  The Court also received into evidence numerous documents[4] and had before it the parties' Amended Joint Stipulation of Undisputed Facts.[5]  The parties submitted their closing arguments by written brief.[6]

Having considered the parties' closing briefs together with the record and the evidence adduced at trial, the Court sets forth below its findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[7]

---

[2]  Doc. 132 (Amended Joint Stipulation of Undisputed Facts ("Jnt. Stip.")) ¶ 48 c–e.

[3]  Assignment and Assumption of Land Purchase Contract, between Debtor and D.R. Horton.  Jnt. Stip. ¶¶ 17, 48f.

[4]  Docs. 138 & 139 (annotated exhibit lists).

[5]  Doc. 132.

[6]  Docs. 169–171.

[7]  Fed. R. Bankr. P. 7052 is made applicable to the Motion to Assume by Fed. R. Bankr. P. 9014(c) and to the Complaint and Counterclaims by Fed. R. Bankr. P. 7001.

**Jurisdiction**

This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(a), 1334(b) and 1452. The Motion to Assume is a "core" proceeding pursuant to § 157(b)(2)(A) and (O).

**Facts**

Debtor Summit II, LLC, which was formed in early February 2021, is in the business of buying and developing real estate. Debtor was formed specifically to purchase and thereafter develop an approximate 170-acre property in Pasco County, Florida, now annexed into Dade City, Florida, from Harry and Janet Denlinger (the "Denlinger Property").[8] Debtor seeks to acquire the Denlinger Property to develop it into a 418-lot residential subdivision and to sell the developed lots to D.R. Horton, who will then construct homes on the lots.

On November 18, 2020, the Denlingers and D.R. Horton executed a Land Purchase Contract for the sale of the Denlinger Property to D.R. Horton for $2,856,000 (the "Main Contract").[9] The Main Contract was negotiated by and between the Denlingers, through counsel, and D.R. Horton and was based upon basic terms set forth in a Letter of Intent dated September 18, 2020 (the "LOI"). The LOI provides that D.R. Horton would have the right to assign the contemplated purchase agreement; no restrictions upon that right are indicated.[10] Paragraph 18(k) of the Main Contract affirms this unqualified right providing, in relevant part:

> This Contract shall be binding upon and shall inure to the benefit of Seller and Buyer, their respective heirs, successors, legal representatives and permitted assigns. Buyer may assign its rights and obligations hereunder. . . . Seller may not assign its rights and obligations hereunder without the prior written consent of Buyer, which shall not be unreasonably withheld. . . .[11]

---

[8] The Denlinger Property is adjacent to a 135-acre residential subdivision project, which consists of 406 home sites, owned by and currently under development by Summit View LLC. Summit View LLC is a sister entity of Debtor that is also managed by Dr. Weiland. Jnt. Stip. ¶¶ 1, 3–4.

[9] Jnt. Stip. ¶ 48c.

[10] Debtor's Ex. 87 (hereafter, "D's Ex(s). XX"). Debtor's exhibits are filed in the Adversary at Docs. 65–67.

[11] D's Ex. 2 ¶ 18(k).

The Main Contract also grants D.R. Horton the right, in its sole and absolute discretion, to pursue governmental land use entitlements for the Denlinger Property, such as rezoning, annexation, and site plan approvals.[12]   The Denlingers are obligated to execute applications and to cooperate with D.R. Horton's efforts to obtain any such governmental approvals for the property preclosing.[13]   Additionally, the Main Contract contains a separate mutual cooperation clause.[14] The full text of these provisions is as follows:

> [5]b.  <u>Pursuit of Approvals</u>.  Buyer shall have the right to pursue from all applicable governmental authorities having jurisdiction over the Property, including, without limitation, Pasco County, Florida and the State of Florida (and their respective agencies) (collectively and as applicable, the "Governing Jurisdiction") all final, non-appealable site plan approvals, annexation approvals (including, without limitation, the annexation of the Property into Dade City, Florida), construction plan approvals, zoning approvals, variances, land disturbance permits, building permits, wetland permits, curb cut approvals, and other Federal, State and municipal approvals and permits that Buyer deems, in its sole absolute discretion, necessary or desirable for the development of the Property as intended by Buyer (collectively the "Approvals").  In connection with Buyer's applications for and efforts to obtain the Approvals, Seller shall cooperate with Buyer's effort and shall execute such applications and take such actions as are reasonably requested by Buyer.  Buyer's pursuit of the Approvals shall be at Buyer's sole cost and expense.

> [5]c.  <u>Mutual Cooperation</u>.  Seller and Buyer will each cooperate with each other, their employees, and agents, in a reasonable and timely fashion in the execution of such documents and instruments as may be required to effectuate the transaction herein envisioned and to facilitate the purpose and intent of this Contract.

The Main Contract provides for notice and cure rights in the event of a default.[15] Specifically, the non-defaulting party is obligated to provide the defaulting party notice "specifying in reasonable detail the nature of the default."[16]   The defaulting party thereafter has

---

[12]  Jnt. Stip. ¶ 11; D's Ex. 2 ¶ 5(b).
[13]  D's Ex. 2 ¶ 5(b).
[14]  D's Ex. 2 ¶ 5(c).
[15]  D's Ex. 2 ¶ 15(d).
[16]  *Id.*

forty-five days to cure.  A timely cure assures the defaulting party that it will not incur liability to the non-defaulting party for the default.  Echoing the mutual cooperation provision above, the notice and cure provision requires that "[e]ach party shall reasonably cooperate with any and all attempts by the other to cure any default with the Cure Period."[17]  The notice and cure provision does not carve out any particular default from falling within its scope.

The Main Contract also includes a "time is of the essence" provision.  The provision applies "in the occurrence of all events, the satisfaction of all conditions and the performance of all obligations hereunder."[18]

The Denlingers and D.R. Horton subsequently executed two amendments to the Main Contract: a First Amendment to Land Purchase Contract, dated January 12, 2021 (the "First Amendment") and a Second Amendment to Land Purchase Contract, dated May 3, 2021 (the "Second Amendment").[19]  The First Amendment provides, *inter alia*, for changes to the provisions governing the earnest money deposit and extends the timeline for closing.  The Second Amendment increases the purchase price to $2,906,000 and further alters the timeline for closing. With regard to the closing, the Second Amendment provides:

> Closing shall be held on or before the date that is five (5) business days after Buyer has secured final, non-appealable approvals from the Governing Jurisdiction for Buyer's pending applications for annexation of the Property into Dade City, Florida and a comprehensive plan and rezoning of the Property; provided that Closing must take place on a Tuesday, Wednesday or Thursday that is a business day (a "Permitted Closing Day") and may be extended no more than an additional five (5) days in order to be scheduled on one of those days of the week.  Closing shall be held at a time, date and location designated by Buyer.

---

[17]  D's Ex. 2 ¶ 15(d).
[18]  D's Ex. 2 ¶ 18(b).
[19]  Jnt. Stip. ¶¶ 48d & 48e, respectively; *see also* D's Exs. 3 & 4, respectively.

Both the First and Second Amendments provide that the amendment is not enforceable as to D.R. Horton absent written corporate ratification thereof.[20] But unlike the Main Contract, which requires corporate ratification by D.R. Horton within thirty days, neither amendment provides a deadline by which corporate ratification is required.[21]

In both the First and Second Amendments, the Denlingers ratify the Main Contract, as amended, and confirm that the agreement "continue[s] in full force and effect."[22]

On June 11, 2021, D.R. Horton ratified the First and Second Amendments. On that same date, D.R. Horton also ratified an Assignment and Assumption of Land Purchase Contract, wherein D.R. Horton assigns the Land Contract to the Debtor (the "Assignment"),[23] and a Lot Purchase Agreement, wherein Debtor contracts to sell 418 residential lots, which it planned to develop on the Denlinger Property, to D.R. Horton for $31,350,000 (before escalations) (the "Lot Sale Contract").[24] Though it includes mutual indemnification provisions, the Assignment does not purport to extinguish any potential liability of D.R. Horton to the Denlingers on the Land Contract.

On July 13, 2021, at a final public hearing, the Dade City Council, *i.e.*, the "Governing Jurisdiction," approved D.R. Horton's applications[25] to (1) annex the Denlinger Property into Dade City, (2) rezone the Denlinger Property to Dade City PD-R (Planned Development-Residential) (the "Zoning Ordinance"), and (3) amend the Future Land Use Plan Element of the Dade City

---

[20] D's Exs. 3 ¶ C & 4 ¶ C.

[21] *Compare* D's Ex. 2 ¶ 21 *with* D's Exs. 3 ¶ C & 4 ¶ C.

[22] D's Exs. 3 ¶ J & 4 ¶ H. Both amendments provide:

> The terms and provisions set forth in this Amendment shall modify and supersede all inconsistent terms and provisions set forth in the Agreement. Except as revised herein, the Agreement remains unmodified. As modified herein, the Agreement is ratified and confirmed in all respects, and shall continue in full force and effect.

The First Amendment defines "Agreement" as the Main Contract; the Second Amendment defines "Agreement" as the Main Contract as modified by the First Amendment.

[23] Jnt. Stip. ¶ 48f; *see also* D's Ex. 5.

[24] Jnt. Stip. ¶ 48g; *see also* D's Ex. 46. Debtor anticipated that its costs to construct the proposed lots would be approximately $14,000,000, which would be financed by issuing Florida Community Development District Bonds or through other financing and capital available to Debtor.

[25] D.R. Horton was appointed by the Denlingers as their representative for purposes of the applications. D's Ex. 28.

Comprehensive Plan (collectively, the "Entitlements").[26]   Though passed at the hearing, the Zoning Ordinance was not recorded in the public records with the other two ordinances in the few days following the hearing.[27]   Recordation of the Zoning Ordinance was delayed in order for a Planned Development Agreement (the "PD Agreement"),[28] which significantly enhanced the value of the property, to be executed as required by Dade City Land Development Regulations.[29]   While the Dade City Mayor signed the PD Agreement on July 13, its processing was held pending the necessary signatures of the property owners—the Denlingers.   Following the July 13 hearing, the only item remaining to finalize the rezoning was the Denlingers' execution of the PD Agreement.

On July 20, 2021, the Dade City Master Clerk sent an email asking whether the PD Agreement had been signed by the Denlingers so as "to complete the signature process."[30]   This email would precipitate a series of emails in which the Denlingers were asked repeatedly, through Dr. Shea, to finalize the signature process by executing the PD Agreement.   But the Denlingers repeatedly refused to sign.

The Denlingers' repeated failures to sign the PD Agreement eventually led Dr. Weiland to direct Mr. Cremer to issue a formal notice of default pursuant to ¶ 15(d) of the Land Contract asserting that the Denlingers' execution of the PD Agreement was required under ¶ 5(b) of the Land Contract as a reasonable request necessary to complete the rezoning approval process (the

---

[26]  Jnt. Stip. ¶ 20.

[27]  D's Exs. 30 & 33.

[28]  Jnt. Stip. ¶ 48j; *see also* D's Ex. 34.

[29]  D's Ex. 38 (City of Dade City, Florida – Land Development Regulations § 2.5.7:

> *A Development Agreement shall be executed by all persons having legal or equitable title in the land subject to the Development Agreement*, including the fee simple owner and any mortgagees, unless the City Attorney approves the execution of the Development Agreement without the necessity of such joinder or subordination based on a determination that the substantial interests of the City will not be adversely affected thereby.   *A Development Agreement is determined to be a legislative act of the City in the furtherance of its powers to plan, zone and regulate development within its boundaries.* . . . (emphasis added)).

[30]  D's Ex. 88.

"First Notice"). The First Notice was dated August 26, 2021.[31]

In the weeks between the July 13 hearing and the issuance of the First Notice, Mr. Cremer and Dr. Shea communicated frequently regarding issues related to the closing on the Denlinger Property.[32] Around the time the First Notice was issued, Mr. Cremer and Dr. Shea had agreed, subject to client approval, to a "path to closing."[33] In an email shortly after the First Notice, Dr. Shea confirmed that the Denlingers agreed to the planned "path," which estimated a closing on the Denlinger Property in late October.[34]

As part of the "path to closing," the Denlingers agreed to execute the PD Agreement, which Dr. Shea would hold pending confirmation that the full purchase price for the property was placed in escrow. This arrangement was precipitated due to the Denlingers' alleged concerns that Debtor might not have sufficient funds to close.

Dr. Weiland, on behalf of Debtor, had entertained several financing options to fund the acquisition of the Denlinger Property. The credible evidence shows that at no time was Debtor unable to fund the purchase of the Denlinger Property.

Ultimately, to fund the purchase and initial development of the Denlinger Property, Debtor and D.R. Horton entered into an amendment to the Lot Sale Contract dated August 19, 2021 (the "Lot Sale Contract Amendment"),[35] by which D.R. Horton agreed to release its earnest money deposit in the amount of $3,135,000 to Debtor.[36] This arrangement was economically advantageous to both Debtor and D.R. Horton. Debtor obtained essentially a zero-interest loan that, in turn, allowed D.R. Horton to obtain a lower price for the developed lots. The Lot Sale

---

[31] D's Ex. 12; *see* D's Exs. 74–76.

[32] D's Exs. 72–74.

[33] D's Exs. 74–76.

[34] D's. Exs. 76 & 74.

[35] D's Ex. 47. The Lot Sale Contract was amended a second time shortly after the petition was filed. D's Ex. 48.

[36] D's Exs. 52–54.

Contract Amendment was ratified by D.R. Horton corporate on September 17, 2021, and a few days later on September 23, D.R. Horton wired the earnest money deposit as a credit in Debtor's name to DHI Title of Florida, Inc. (the "Title Company"), which was handling the closing.[37]  To date, those funds remain in escrow.

In accord with the "path to closing," the Denlingers executed the PD Agreement in early September and placed the executed agreement in Dr. Shea's care.  The Denlingers were kept apprised of the progress of the Lot Sale Contract Amendment and the intent of Debtor to use the earnest money deposit released thereunder to fund the purchase.  Oddly, on the afternoon of September 13, 2021, before receiving confirmation of the deposit into escrow, Dr. Shea filed the executed PD Agreement with the Dade City Clerk, who then recorded it along with the Zoning Ordinance.[38]  At that point, the closing countdown clock began to run.

The Denlingers explained their initial resistance to executing the PD Agreement on the basis that they were concerned that the PD Agreement obligated them to develop the property. Their concern was founded on the advice of Dr. Shea.  Their concern, if sincere, was misplaced.

It is clear from the face of the PD Agreement that the landowner has no obligation to do anything, unless and until they chose to develop the property.  And if they chose to develop the property, they would receive all sorts of benefits including the increased density allowed by the Zoning Ordinance.  It cannot reasonably be disputed that the PD Agreement and the Zoning Ordinance greatly increased the value of the Denlinger Property.

But even if the PD Agreement had imposed such obligations, upon conveyance of the property to Debtor, the Denlingers would have been released from those obligations pursuant to paragraph 19 of the PD Agreement, which provides:

---

[37] D's Exs. 41 & 47; Jnt. Stip. ¶¶ 22–23.
[38] D's Ex. 34.

Binding Effect. This PD Agreement shall run with the land, shall be binding upon and inure to the benefit of the OWNER and its assigns and successors in interest. OWNER, in its sole discretion, shall have the right to make a conveyance or an assignment of its interest in the Property to a successor, in which all rights and obligation of OWNER hereunder shall be assigned to and assumed by the successor, and OWNER shall thereafter have no further obligations under this PD Agreement. The CITY Commission will automatically approve transfer of title by OWNER to the Subject Property.[39]

By early October 2021, the parties were working together toward a closing that had been scheduled for Monday, October 18, 2021. In an email dated October 7, Dr. Shea confirms that he agreed with Mr. Cremer that based upon its recordation on September 13, 2021, the last day the Zoning Ordinance could be appealed was October 14. He also states that he understood that the parties had agreed to close on October 18.[40] A few days later, on October 11, he indicates by email that he believed matters were "good to go" and asks Mr. Cremer to direct the Title Company to prepare the closing package.[41] In an email inquiry sent to the Title Company at 12:09 p.m. on Friday, October 15, Dr. Shea indicates that "time is of the essence" as the closing was set for the following Monday.[42] Mere hours later, his story would change.

At 8:25 p.m. on October 15, 2021, Dr. Shea sent an email to Mr. Cremer in which he states that based upon a conversation with an unnamed Dade City employee, he now believed that the Land Contract had expired.[43] Dr. Shea testified that he spoke with a "technician" in the planning and zoning department who indicated that the appeal period for the Zoning Ordinance had expired in late August. Dr. Shea's testimony and his change of heart were not credible.

The Land Contract on the Denlinger Property did not close on October 18 because the Denlingers declined to appear. Mr. Cremer attempted to reschedule the closing for October 21,

---

[39] D's Ex. 34 ¶ 19.
[40] D's Ex. 13.
[41] D's Ex. 77.
[42] D's Ex. 61.
[43] Jnt. Stip. ¶ 24; D's Ex. 78.

but the Denlingers again declined to close.  On October 22, Mr. Cremer issued a second notice of default pursuant to ¶ 15(d) of the Land Contract demanding that the Denlingers close in accord with the contract (the "Second Notice").[44]

The Denlingers did not cure the Second Notice timely.  Instead, within a matter of days of the issuance of the Second Notice, they filed the Complaint in state court.  At no point prior to the bankruptcy did the Denlingers issue a notice of default pursuant to ¶ 15(d) of the Land Contract. No closing other than the failed attempt on October 18, 2021, was ever scheduled.

Debtor commenced this Chapter 11 bankruptcy on September 20, 2022, electing to proceed under Subchapter V.  That same day, Debtor removed the State Court Action to this Court.

On October 4, 2022, Debtor filed its sworn schedules and initial disclosures.  Debtor scheduled assets valued, in the aggregate, at approximately $24.6 million and liabilities, all of which were nonpriority unsecured debts, of approximately $3.6 million.  The bulk of Debtor's scheduled assets are its claimed contractual rights under the Land Contract and Lot Sale Contract, as amended, and its contingent damages claim against the Denlingers.[45]

On February 2, 2023, approximately one month before trial, Dr. Shea sent D.R. Horton a letter in which he invokes ¶ 10(c) of the Land Contract and claims that contract is in default and therefore terminated due to the failure of D.R. Horton to send a notice of suitability.[46]  The next day, having been made aware of the letter, Dr. Weiland responded on behalf of Debtor providing the Denlingers with a notice of suitability, which, he notes, D.R. Horton adopted.  Stating that the notice was being provided with in the 10-day cure period provided by ¶ 10(c) of the Land Contract, Dr. Weiland disputed the Denlingers' contention that the Land Contract had terminated.[47]

---

[44] D's Ex. 42.
[45] Doc. 15.
[46] D's Ex. 62.
[47] D's Ex. 63.

### Discussion

*The Motion to Assume*

Debtor, noting it was formed for the very purpose of acquiring the Denlinger Property and developing it with the assistance of D.R. Horton, seeks, in its business judgment, to assume the Land Contract and close on the Denlinger Property. Debtor contends that assumption of the Land Contract, which it asserts is executory, would benefit and is in the best interest of the estate.

The Denlingers oppose the Motion to Assume on two grounds.[48] First, and principally, they argue the Land Contract is not assumable as it expired prepetition by its terms when Debtor failed to close timely. Second, they argue that Debtor cannot assume the Land Contract as it is not properly a party to the agreement due to the failure of Denlingers to consent to the Assignment.

Section 365(a) of the Bankruptcy Code,[49] as made appliable to a Subchapter V debtor-in-possession by § 1184, provides that with the Court's approval, a debtor "may assume or reject any executory contract . . . of the debtor." "A primary purpose of the statute is to allow for the assumption of contracts that are beneficial to the estate, and the rejection of contracts that are burdensome to the estate."[50]

A debtor's request to assume or reject an executory contract is examined under the "business judgment rule." Generally, a bankruptcy court should bestow "perfunctory approval" upon a debtor's decision to assume or reject an executory contract[51] and "should only withhold [its] approval when 'the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.'"[52] Perfunctory approval notwithstanding, the debtor bears a

---

[48] The Denlingers have abandoned their third argument in response, which is that the Land Contract automatically terminated pursuant to ¶ 10(c) due to the alleged failure of D.R. Horton to provide a notice of suitability timely.

[49] 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code").

[50] *Laudenslager v. Saia* (*In re Laudenslager*), Adv. No. 3:13-ap-00375-PMG, No. 3:12-bk-2186-PMG, 2014 WL 6544285, at *3 (Bankr. M.D. Fla. Nov. 19, 2014).

[51] *In re Weaver Oil Co., Inc.*, No. 08-40379-LMK, 2008 WL 8202063, at *2 (Bankr. N.D. Fla. Nov. 17, 2008).

[52] *In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) (quoting *Richmond Leasing Co.*

threshold burden "to produce credible evidence that [its] decision to assume or reject would benefit the estate or result in a successful reorganization."[53]  Once the debtor satisfies this "lessor burden,"[54] any party objecting to the request bears the burden to show that the debtor's decision "derives from bad faith, whim, or caprice."[55]

The Bankruptcy Code does not define the term "executory contract," and the Eleventh Circuit has not formally adopted any particular definition.  Recently, Judge Robson of this Court recognized that the "common starting point" in the analysis is to consider the definition first articulated by Professor Vern Countryman, *i.e.*, "whether performance is due to some extent on both sides."[56]  Examining *In re General Development Corp.*,[57] Judge Robson then concluded that "Eleventh Circuit precedent recognizes the 'functional approach' to analyze whether a contract is executory."[58]  Under the functional approach, "the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate."[59]

Generally, contracts for the sale of real property are found to be executory,[60] and applying the functional approach here, there is little doubt that the Land Contract, if unexpired, is executory. There is also little doubt that the proposed assumption represents a proper exercise of Debtor's business judgment.  Assumption of the Land Contract, along with the Lot Sale Contract, would be

---

*v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *see, e.g.*, *Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 975 n.2 (11th Cir. 1987).

[53]  *In re Prestige Motorcar Gallery, Inc.*, 456 B.R. 541, 544 (Bankr. N.D. Fla. 2011); *see, e.g.*, *In re Sun City Invs., Inc.*, 89 B.R. 245, 249 (Bankr. M.D. Fla. 1988).

[54]  *In re Sun City Invs., Inc.*, 89 B.R. at 249.

[55]  *In re Weaver Oil Co.*, 2008 WL 8202063, at *2.

[56]  *In re Kissimmee Condos P'ship, LLC*, No. 6:22-bk-00994-GER, 2023 WL 1318105, at *2 (Bankr. M.D. Fla. Jan. 31, 2023).

[57]  *Sipes v. Atl. Gulf Cmtys. Corp. (In re Gen. Dev. Corp.)*, 84 F.3d 1364 (11th Cir. 1996).

[58]  *In re Kissimmee Condos P'ship*, 2023 WL 1318105, at *2.

[59]  *In re Gen. Dev. Corp.*, 84 F.3d at 1375.

[60]  *See, e.g.*, *Chira v. Saal (In re Chira)*, 367 B.R. 888, 895 (S.D. Fla. 2007) ("In the context of real estate contracts, courts have generally found contracts for the sale of real property to be executory in nature." (listing cases)); *In re Laudenslager*, 2014 WL 6544285, at *2; *see generally In re Gen. Dev. Corp.*, 84 F.3d at 1373–75 (reviewing and approving the analysis made by the bankruptcy court regarding executoriness of a homesite purchase agreement).

extremely beneficial for the estate, allowing creditors to be paid in full (and then some).  Frankly, assumption of the Land Contract is imperative if Debtor is to have any hope of a successful reorganization.  But the parties do not really dispute these points.

Instead, the parties' dispute centers on whether the Land Contract remains in effect or whether it expired, prepetition, pursuant to its terms.  "It is axiomatic that before 11 U.S.C. § 365 can apply a contract must exist.  If a contract has expired by its own terms then there is nothing left to assume or reject."[61]

*The Contract Did Not Expire and Is Still in Effect*

Debtor and D.R. Horton assert that the Land Contract is still in effect, albeit in a state of breach based upon the Denlingers' failure to close on October 18, 2021.  The Denlingers, much belatedly, take the position that the Land Contract expired some three months prior in late August, when they assert the Entitlements became final and non-appealable and Debtor failed to close.

The issue that the Court must decide is when, pursuant to the Land Contract, the closing on the Denlinger Property is required to occur.  It has been stipulated that the closing date stated in the Main Contract was extended by both the First and Second Amendments.[62]  In the Second Amendment, D.R. Horton increased the purchase price by $50,000 so as not to have a drop-dead closing date, *i.e.*, a date certain, but rather to have the closing tied to the finality and non-appealability of the Entitlements.  The Land Contract, as amended, states that the closing must occur within five business days after D.R. Horton secured "final, non-appealable approvals from the Governing Jurisdiction" on its pending applications for the Entitlements.

---

[61] *Texscan Corp. v. Commercial Union Ins. Cos. (In re Texscan Corp.)*, 107 B.R. 227, 230 (B.A.P. 9th Cir. 1989), *aff'd*, 976 F.2d 1269 (9th Cir. 1992); *see, e.g.*, *In re Ecoventure Wiggins Pass, Ltd.*, 406 B.R. 123, 127 (Bankr. M.D. Fla. 2009) ("Where the sale contract was validly terminated before the bankruptcy case was filed, however, it is fundamental that the contract may not be resurrected and assumed by the debtor.").

[62] Jnt. Stip. ¶¶ 14–15.  Any issues or claimed defaults before May 3, 2021, were waived by the Denlingers when they ratified the Second Amendment to the Main Contract.  The Denlingers were bound, even if the Second Amendment was subject to corporate ratification by D.R. Horton.

The Entitlements manifested in three separate ordinances. It is largely agreed that two of the three ordinances enacted on July 13, 2021, became final and non-appealable no later than Aug. 16, 2021.[63] The parties disagree, however, as to the date upon which the Zoning Ordinance became final and non-appealable.

A local government's rezoning decision may be challenged on appeal in Florida Circuit Court through a petition for writ of certiorari or *de novo* action under Fla. Stat. § 163.3215(3).[64] Such a challenge must be filed "within 30 days of *rendition* of the order to be reviewed."[65] The key term is "rendition." Courts use the definition of "rendition" provided in Rule 9.020(h) of the Florida Rules of Appellate Procedure: "An order is rendered when a signed, written order is filed with the clerk of the lower tribunal."[66] Thus, "[r]endition requires three things: an order that is *signed*, *written*, and *filed* with the 'clerk of the lower tribunal.'"[67]

The Zoning Ordinance was approved by the Dade City Council simultaneously with the PD Agreement on July 13, 2021. However, unlike the other two ordinances, the Zoning Ordinance was not immediately recorded. Instead, its recordation was held pending receipt of the fully executed PD Agreement. And it took several more weeks and the issuance of the First Notice before the Denlingers agreed to execute the PD Agreement. The Denlingers' contention that the PD Agreement imposed a duty upon them to develop the property is not at all credible. To the extent Dr. Shea may have advised them otherwise, they simply got bad advice.

---

[63] D's Exs. 30 & 33. Two of the three ordinances passed at the July 13 hearing were recorded in the Public Records of Pasco County on or about July 16, 2021. Both were subject to thirty-day appeal period beginning no later than the date the ordinances were recorded.

[64] *See* Fla. Stat. § 163.3215(3); *Smull v. Town of Jupiter*, 854 So. 2d 780, 782–83 (Fla. 4th DCA 2003).

[65] Fla. R. App. P. 9.100(c)(1) (emphasis added); *see* Fla. Stat. § 163.3215(3) ("The de novo action must be filed no later than 30 days following *rendition* of a development order or other written decision, or when all local administrative appeals, if any, are exhausted, whichever occurs later." (emphasis added)).

[66] *See, e.g., Pettway v. City of Jacksonville*, 264 So. 3d 210, 212 (Fla. 1st DCA 2018); *5220 Biscayne Blvd., LLC v. Stebbins*, 937 So. 2d 1189, 1191 (Fla. 3d DCA 2006); *Smull*, 854 So. 2d at 78.

[67] *Pettway*, 264 So. 3d at 213 (emphasis in original).

Once the PD Agreement and the Zoning Ordinance were recorded on September 13, 2021,

they were "rendered."[68]  At that point, a signed, written order was *filed* with the appropriate clerk.[69]

Dade City Land Development Regulations ("DC LDR") required recordation of the PD Agreement

and the Zoning Ordinance with Pasco County for the rezoning to become final.[70]  As in *Pettway*

*v. City of Jacksonville*, the recordation requirements of the DC LDR can be harmonized with the

Florida Rules of Appellate Procedures.[71]  Recordation not only serves the purpose of providing a

complete public record of the rezoning action for purposes of preparing a "meaning complaint for

review"[72] but also serves the pragmatic purpose of providing a clear means of determining when

the city's quasi-judicial order is deemed final.[73]

The concept of rendition is not unique or unknown.  Nor is the difference between a final

judgment and a non-appealable one.  For example, a judgment is final and effective upon its entry,

unless its effectiveness is stayed pending appeal.  But that same final judgment is appealable for

some time after its entry.

As should now be clear, the Court agrees with Debtor and D.R. Horton that the Zoning

Ordinance became final and non-appealable on October 14, 2021.  Closing was therefore required

---

[68]  *Cf. 5220 Biscayne Blvd.*, 937 So. 2d at 1191–92 ("[U]ntil the development order is filed with the City Clerk and becomes available for public review, the public may not learn that the development order has been executed, nor what the final content of the order is so as to file a meaningful complaint for review.").

[69]  *Cf. Pettway*, 264 So. 3d at 213–14.

[70]  Absent proof of the recordation of a rezoning ordinance within six months of the approval, the zoning would automatically revert to its prior zone district classification. Further, no application for development in accord with the rezoning may be considered until the PD agreement and the adopting ordinance are recorded. DC LCR § 2.4.3(D)(6), *available at* https://www.dadecityfl.com/our_government/departments/community___economic_development/ current_planning-development_review.php#outer-8 (last visited May 3, 2023); *see also* DC LCR § 2.5.8(B) ("A Development Agreement shall not be effective until it is properly recorded in the public records of Pasco County, and until thirty (30) days after having been received by FDEO in accordance with this subsection.").

[71]  *Pettway*, 264 So. 3d at 213 ("The remaining question is whether giving effect to the City's "Final Order" rule can be harmonized with the Florida appellate rules.  It can. . . . Under the circumstances presented, the important municipal goals of [the City's "Final Order" rule]—ensuring finality of its quasi-judicial ordinances and timely notice to affected persons—can coexist with Florida's appellate rules.").

[72]  *5220 Biscayne Blvd.*, 937 So. 2d at 1191.

[73]  *Pettway*, 264 So. 3d at 213–14.  Until the full scope of a planned rezoning is determinable, it is difficult to determine who might be adversely affected by the order such that the individual would have standing to appeal.  *See Dunlap v. Orange Cnty.*, 971 So. 2d 171, 174 (Fla. 5th DCA 2007).

under the Land Contract within five business days.  October 18 was within that timeframe.

If the Denlingers disagreed with Debtor's calculation of the appeal period for the Zoning Ordinance, it also was incumbent upon them to provide a notice of default under ¶ 15(d) of the Land Contract and demand an earlier closing date.  But here, the Denlingers not only affirmatively agreed with Debtor that the period to appeal the Zoning Ordinance would be triggered by its recordation along with the fully executed PD Agreement, a matter which they unreasonably delayed, but also as a condition of their begrudged willingness to sign the PD Agreement, they required Debtor to place the full purchase price into escrow, which the Debtor did and well before the October 18 closing.  It sits there to this day.[74]

Citing the "time is of the essence" provision, the Denlingers argue that they were not required to issue a notice of default under ¶ 15(d) of the Land Contract to alert Debtor to its failure to close on the contract in late August, when they claim the Zoning Ordinance became final and non-appealable.  They contend that where a real estate purchase contract contains a "time is of the essence" provision, a buyer has no entitlement to notice and opportunity to cure a failure to timely close.  They argue, therefore, that to impose upon them an obligation to issue a notice of default under ¶ 15(d) of the Land Contract to Debtor for its failure to close timely would render the "time is of the essence" provision meaningless.  But the Denlingers' argument, which overlooks that the parties had contracted specifically to remove a drop-dead closing date, cuts both ways.

To accept the Denlingers' position would have the effect of rendering the notice and cure provision without effect.  The Land Contract's default provisions do not carve out any particular

---

[74] The deposit was received September 23, 2021.  Had the Denlingers declared a default on or about Aug. 26, when they claim the contract expired, the deposit would have been received well within the 45-day cure period, and it might have been made even earlier based on Mr. Lynch's testimony.

default from the auspices of the notice and cure provision;[75] rather, the default provisions speak of defaults "in the performance of *any* obligation or covenant hereunder."[76]  And while the cases cited by the Denlingers support their assertion, the rule is not absolute.[77]  Further, the cited cases are distinguishable as they involve contracts with drop-dead payment or closing dates and did not appear to involve contracts with notice and cure provisions similar to the Land Contract.[78]

By agreement, the Land Contract does not provide for a closing by a date certain.  Rather, the closing is tied to a future event that at the time of the Second Amendment, the parties anticipated would occur in the near future.  For a court to enforce a "time is of the essence" provision in the manner the Denlingers seek, it must be very clear from the agreement what performance is required, by whom, and when.[79]

Because the notice and cure provision, which does not carve out any specific default, and the "time is of the essence" provision, which applies broadly to all terms and conditions, appear to be in conflict, the Court must construe them "so as to be reconciled, if possible[, . . .] giv[ing]

---

[75]  *See Sun Bank of Miami v. Lester*, 404 So. 2d 141, 142 (Fla. 3d DCA 1981) (contract provided for notice of default and opportunity to cure where default consisted of "an act or omission other than the failure to close when specified or failure to pay monies when required."); *see also United States v. Ranch Located at 5600 Sw. 61st Ave., Davie, Fla.*, No. 03-60130-MARRA/SELTZER, 2005 WL 8165475, at *2 (S.D. Fla. Dec. 28, 2005) (observing that although the contract contained a notice and cure provision, notice was not required with regard to the escrow deposit), *aff'd*, 207 F. App's 966 (11th Cir. 2006).

[76]  D's Ex. 2 ¶¶ 15(a) & (b) (emphasis added).

[77]  *See, e.g., Delta Mobile Homes, Inc. v. Ehmann*, 275 So. 2d 269, 270 (Fla. 3d DCA 1973) ("[W]here time is of the essence in a contract, no notice of default is required.  However, there are exceptions to this rule." (citations omitted)).

[78] *See Denton v. Good Way Oil*, 902 So. 3d 103 (Fla. 4th DCA 2010) (buyer failed to tender payment on fixed drop-dead closing date; notice and cure provision not discussed); *MasTec, Inc. v. TJS, LLC*, 979 So. 2d 285 (Fla. 2d DCA 2008) (buyer failed to tender payment on fixed drop-dead closing date; notice and cure provision seemingly limited to title defects); *Arvilla Motel, Inc. v. Shriver*, 889 So. 2d 887, 890 (Fla. 2d DCA 2004) (buyer failed to tender payment on fixed drop-dead closing date; notice and cure provision not discussed); *see also United States v. Ranch Located at 5600 Sw. 61st Ave., Davie, Fla.,* 207 F. App'x 966 (11th Cir. 2006) (buyer failed to tender escrow deposit timely; notice and cure provision did not apply to deposit).  *Arvesu v. Blancom Props., NV*, 913 So. 2d 1231 (Fla. 3d DCA 2005), also cited by the Denlingers, does not appear fully on point.  Although the case involved a buyer who failed to tender timely payments, the court made no mention of a "time is of the essence" clause.

[79]  *See Jackson v. Holmes*, 307 So. 2d 470, 472 (Fla. 2d DCA 1975) ("[A] 'time is of the essence' provision will be given effect in an equitable proceeding pro[v]ided it is shown to be clearly applicable to the contract requirement against which it is sought to be applied."); *see also Arvilla Motel, Inc.*, 889 So. 2d at 890 (observing that in order to enforce a "time is of the essence provision," a court must know: "What performance at what time is a condition of which party's duty to do what?" (quoting *Jackson*, 307 So. 2d. at 472)); *see generally Realty Sec. Corp. v. Johnson*, 93 Fla. 46 (1927) (discussing enforcing, in equity, "time is of the essence" provisions).

effect to the intent of the parties in accord with reason and probability as gleaned from the whole agreement and its purpose."[80]    Here, the Court can do so by construing the notice and cure provision to apply to any and all defaults under the Land Contract and the "time is of the essence" provision to apply to any and all notices of default issued pursuant to ¶ 15(d).[81]

According to the Denlingers, they decided not to close on October 18, 2021, only when an unidentified "technician" with Dade City's planning and zoning department allegedly told Dr. Shea that the appeal period for the Zoning Ordinance expired on August 26, 2021.  Dr. Shea's testimony on this point was not credible, was not supported by any phone records or notes, and ultimately was not relevant.[82]  The decision not to close on this flimsy basis, after hours, the Friday before a Monday closing, was simply a breach of the Land Contract by the Denlingers.

Dr. Shea's attempt to terminate the Land Contract post-petition was arguably a violation of the automatic stay, even though he sent the notice of default to D.R. Horton.  Regardless, the attempt demonstrates the infirmity of the Denlingers' position in refusing to close.

As it happens, the Land Contract is not ambiguous as to when the transaction must close. The Land Contract simply does not have a drop-dead closing date.   The Land Contract

---

[80] *Anarkali Boutique, Inc. v. Ortiz*, 104 So. 3d 1202, 1205 (Fla. 4th DCA 2012) (quoting *Arthur Rutenberg Corp. v. Pasin*, 506 So.2d 33, 34 (Fla. 4th DCA 1987)); *see, e.g.*, *SHM Cape Harbour, LLC v. Realmark META, LLC*, 335 So. 3d 754, 759–61 (Fla. 2d DCA 2022).

[81] The Court need not, and does not, decide whether the Denlingers would have waived their right to rely upon the "time is of the essence" provision. *See Ranch Located at 5600 Sw. 61st Ave., Davie, Fla.*, 207 F. App'x at 970 ("Time-is-of-the-essence clauses may be waived by the conduct of the parties.").  That said, the Denlingers' unreasonable refusal to execute the PD Agreement, which delayed the setting of the closing, and their affirmative agreement in emails to Debtor's calculation of the appeal period for the Zoning Ordinance, upon which Debtor justifiably relied, together with the fact that all material information necessary to calculate the closing date was available at all times to the Denlingers, seem to make for a strong showing of a waiver.

[82] For that matter, working backward, for August 26, 2021, to be the date the appeal period ended, the thirty-day period would necessarily have begun on July 27, a full two weeks after the July 13 final hearing.  This time lapse alone suggests that something more than the simple passing of the ordinance or the affixation of the mayor's signature was required to trigger the appeal deadline.  Perhaps Dr. Shea was including the contractually available additional days to close in his references to August 26.  But the city's "technician" likely had no knowledge of the Land Contract and certainly, if knowledgeable on appeal period deadlines as suggested, would not have included those additional days in the calculation of the appeal deadline, thus further undercutting the credibility of Dr. Shea's testimony.  There is also no evidence to suggest that Dr. Shea advised the "technician" that the Denlingers refused to sign the PD Agreement until September.

unambiguously provides that the Entitlements had to be final and non-appealable to trigger the buyer's obligation to close.  Rather than create an ambiguity, the Second Amendment simply requires outside information (information that is readily ascertainable) to calculate the proper closing date.  The parties' intent is clear on the face of the Land Contract.

Indeed, the Denlingers received an additional $50,000 towards the purchase price so that D.R. Horton (and Debtor) could be certain that the Entitlements were unassailable before being required to close.  D.R. Horton (and Debtor) agreed to pay for this extra measure of certainty in view of significant opposition to the development project.  Not only were there neighborhood protesters opposing the project, represented by able counsel, but the Dade City Council's vote was a razor thin 3 to 2.

Paragraph 5(b) of the Land Contract unambiguously gives the "Buyer" the "sole and absolute" discretion to obtain those "Approvals" it determines "necessary or desirable" to develop the property.  This, together with the mutual cooperation provisions in ¶¶ 5(b) & (c), makes it very clear that upon request, the Denlingers are obligated to sign any document reasonably necessary to facilitate D.R. Horton and Debtor's efforts to obtain desired government approvals.  The PD Agreement is certainly within the requests anticipated in the Land Contract.  For that matter, Mr. Cremer's interpretation of the DC LDR that a fully executed PD Agreement is required to secure the necessary rezoning is not unreasonable.

Undeterred, however, the Denlingers stress that the Land Contract does not expressly require them to execute a "PD Agreement."  While true, the non-exhaustive, illustrative nature of the list in the Land Contract, coupled with the absolute discretion accorded the Buyer and the mutual cooperation provisions, makes the Denlingers' claim a non-starter.  Regardless of what the parties may think, it is apparent that the Dade City Clerk required a fully executed PD Agreement

before the Zoning Ordinance could be filed in the Public Records.

*The Assignment to Debtor is Valid and is Not a Novation*

The Denlingers next argue that the Assignment between D.R. Horton and Debtor was, in fact, an attempted novation and that because the Denlingers did not consent, the Assignment is void. The Denlingers' argument is based upon the faulty premise that the Assignment is intended to release D.R. Horton from liability under the Land Contract. That is not the case on the face of the Assignment, nor is it the position taken by either Debtor or D.R. Horton. The Assignment produces no change to the terms of the Land Contract.

Certainly, the Denlingers are correct that in the Assignment, Debtor assumes D.R. Horton's obligation under the Land Contract. But an assignee's assumption of an assignor's obligations under a contract does not, in itself, relieve the assignor of liability to the obligor should the assignee fail to perform. Rather, the assignor remains liable to the obligor, unless the obligor consents to the assignor's release.[83]

It is quite clear, nor really a surprise, that the Denlingers did not consent to the Assignment. But that lack of consent is immaterial. The Land Contract plainly provides for an unqualified right on the part of D.R. Horton to "assign its rights and obligations hereunder."[84] That is precisely what D.R. Horton did. The Denlingers' attempt to impose retroactively a requirement that they consent to the Assignment is both transparent and unpersuasive.

*Debtor Did Not Delay Closing to Secure Financing*

The Denlingers next assert that Debtor delayed the closing on the Denlinger Property in

---

[83] *See Noletto v. NationsBanc Mortg. Corp. (In re Noletto)*, 280 B.R. 868, 872 (Bankr. S.D. Ala. 2001) ("[A] mere assignment does not release the assignor from his or her obligations to the other party under the assigned contract." (quotation omitted)); *Moring v. Miller*, 330 So. 2d 93, 95 (Fla. 1st DCA 1976) ("Whether or not [defendant's] contract with appellant was assignable, such assignment did not relieve [defendant] of liability under the original contract with appellant."); *see also FDIC v. The Colonial BancGroup, Inc. (In re Colonial BancGroup, Inc.)*, No. 2:11CV133, 2012 WL 12878, at *5 (M.D. Ala. Jan. 4, 2012) (listing cases).

[84] In contrast, any assignment on the Denlingers' part is subject to the written approval of the Buyer.

order to obtain financing.  The credible evidence does not support this conclusion.

True, that as the July 13 hearing approached Debtor had not yet determined how to fund the purchase.  But that does not mean that Debtor was without options.  Dr. Weiland testified that based upon his past successes and relationships, he could quickly—within a matter of days—obtain the purchase price from one or more sources.  In addition, it was always apparent that D.R. Horton had an interest in the Debtor obtaining and developing the Denlinger Property for the ultimate benefit of D.R. Horton.

In any event, Debtor did not settle on the arrangement with D.R. Horton out of desperation (as the Denlingers suggest).  Rather, Dr. Weiland examined his several financing options and selected the arrangement with D.R. Horton because it was the most advantageous.  And while the funds were not wired to the Title Company until September 23, there is nothing in the record showing that had it become necessary, the wire could not have been sent before then.

But in the end, the argument is really a red herring because when the closing finally was set pursuant to the terms of the Land Contract, the funds were already deposited with the Title Company and had been for some time.

*The Court Does Not Lack Subject Matter Jurisdiction*

The Denlingers assert that this Court lacks subject matter jurisdiction because the matter at issue is a prepetition, state-law breach of contract claim that has "no nexus to a cause of action stemming from the Bankruptcy Code[,]" nor related to any asset actually owned by the Debtor. The Denlingers focus their argument on the Complaint, which was removed to this Court, and ignore the Motion to Assume, which was jointly tried.  As such, their jurisdictional argument is somewhat misdirected.

As to the Motion to Assume, there can be little doubt that the Court has appropriate

jurisdiction under 28 U.S.C. § 1334(b) and that the matter is a core proceeding.  The right to assume

or reject an executory contract pursuant to § 365 of the Code falls, at a minimum, within this

Court's "arising in" jurisdiction,[85] as the right has no existence outside of a bankruptcy case.[86]

And, "[m]otions to assume or reject executory contracts are core proceedings pursuant to 28 U.S.C.

§ 157(b)(2)(A) and (O), as 'matters concerning the administration of the estate' and 'other

proceedings affecting the liquidation of the assets of the estate[.]'"[87]  Further, where there is a

question as to the very existence of the alleged executory contract, *i.e.*, whether the contract is

property of the estate, as here, the matter is also a "core" proceeding.[88]

As for the Complaint and Counterclaims, in addition to the jurisdiction conferred by the

bankruptcy removal statute,[89] the Court certainly has "related to" jurisdiction under 28 U.S.C.

§ 1334(b).  The adjudication of the related adversary proceeding would have an immeasurable

effect on the administration of Debtor's bankruptcy estate, not simply a "conceivable" one.[90]  The

Debtor's reorganization rests on the determination of its rights under the Land Contract.  Whether

the adversary is a core proceeding is a closer call, but not a call impacting the Court's jurisdiction.[91]

Rather, if the proceeding is a "related to," non-core proceeding, the Court's findings may be

---

[85] 28 U.S.C. § 1334(b).

[86] *See, e.g.*, *In re Great Atl. & Pac. Tea Co., Inc.*, 467 B.R. 44, 58 (S.D.N.Y. 2012), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.*, 508 F. App'x 63 (2d Cir. 2013); *In re New Century Holdings, Inc.*, 387 B.R. 95, 104 (Bankr. D. Del. 2008).

[87] *In re Helm*, 335 B.R. 528, 531 (Bankr. S.D.N.Y. 2006); *see also Harley Hotels, Inc. v. Rain's Int'l, Ltd.*, 57 B.R. 773, 780 (M.D. Pa. 1985) (finding that a motion to assume an executory contract is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (G), (M) and (O)).

[88] *See Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.)*, 475 B.R. 367, 386–87 (Bankr. S.D.N.Y. 2012) ("The determination whether something is property of the estate is a core matter.  Determining whether a contract is property of the estate is also necessary before determining whether a contract may be assumed or rejected, which is likewise a determination within the 'core' jurisdiction of the bankruptcy court." (citations omitted)).

[89] 28 U.S.C. § 1452.

[90] *See, e.g.*, *In re Ryan*, 276 F. App'x 963, 966 (11th Cir. 2008) ("A dispute is 'related to' a case under title 11 when its result 'could conceivably' have an 'effect on the estate being administered in bankruptcy.'" (quoting *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir. 1990))).

[91] *See, e.g.*, *Bavaria Yachts USA, LLLP v. Bavaria Yachtbau GmbH (In re Bavaria Yachts USA, LLLP)*, 575 B.R. 540, 552 (Bankr. N.D. Ga. 2017); *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 152 B.R. 667, 672 (Bankr. M.D. Fla. 1993).

considered as a report and recommendation to the district court in the absence of consent of the parties.[92]  The Denlingers have not consented.[93]

For these reasons, the Court finds that it does not lack subject matter jurisdiction of either the Motion to Assume or the Complaint and Counterclaims.  The Court enters this decision and order with respect to the Motion to Assume, which is a core matter.  The Court will address its rulings with respect to the Complaint and Counterclaims by separate order and will set, also by separate order, the determination of damages issues for later trial.

### Conclusion

The overwhelming evidence establishes that Land Contract has not expired.  Accordingly, Debtor's right to specific performance is explicit and continues till this day.  The Land Contract is an asset of this bankruptcy estate, and it may be assumed by Debtor in this Subchapter V case.[94]  It is not disputed that Debtor has satisfied all other requirements to assume the Land Contract.

The Court finds that Debtor was ready, willing, and able to close on October 18, and would have been even earlier had the Denlingers cooperated and signed the PD Agreement when reasonably requested to do so.  When the Denlingers did not close on October 18, 2021, they materially breached the Land Contract.  The failure to close this purchase and sale transaction falls squarely on the Denlingers' shoulders.

For these reasons, it is therefore **ORDERED** that the Motion (Doc. 20) is **GRANTED**.

Attorney Darrin J. Quam is directed to serve a copy of this Decision and Order on interested parties who do not receive service by CM/ECF and to file proof of service within three days of its entry.

---

[92] *See, e.g.*, *In re Bavaria Yachts USA, LLLP*, 575 B.R. at 552.

[93] Adv. Doc. 4 (Denlingers' statement of no consent pursuant to Fed. R. Bankr. P. 9027(c)(3)).

[94] The Court has assumed that Debtor bore the burden to prove that the Land Contract is still in existence and that it is property of the estate. *Cf. In re Hernandez-Castro*, No. 16-63886-PMB, 2022 WL 1210080, at *1 (Bankr. N.D. Ga. Apr. 22, 2022); *In re Taylor*, No. 6:10-BK-11111-ABB, 2011 WL 9815, at *2 (Bankr. M.D. Fla. Jan. 3, 2011); *In re Santaella*, 298 B.R. 793, 799 (Bankr. S.D. Fla. 2002); *see generally In re Climate Control Mech. Servs., Inc.*, 570 B.R. 673, 677 (Bankr. M.D. Fla. 2017) (noting that in Florida, upon the filing of a bankruptcy petition, a debtor's interest in its prepetition contracts becomes property of the estate).